Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 324-8011 (tel.)
bishop@westernlaw.org

Susan Jane M. Brown
Western Environmental Law Center
4107 N.E. Couch St.
Portland, OR 97232
(503) 914-1323 (tel.)
brown@westernlaw.org

Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> JANE L. COTTRELL, in her official capacity as acting Regional Forester, et al., <br><br> Defendants. | CV 09-107-M-DWM <br><br> FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

INTRODUCTION

1. This case involves a challenge to the United States Forest Service's ("Forest Service's") adoption of the revised Beaverhead-Deerlodge National Forest ("BDNF") Land and Resource Management Plan ("revised Forest Plan") and the Rat Creek timber sale which implements the revised Forest Plan.

JURISDICTION, VENUE, AND BASIS FOR RELIEF

2. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant).

3. This cause of action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; the Appeals Reform Act ("ARA"), 16 U.S.C. § 1612 note; the National Forest Management Act ("NFMA") 16 U.S.C. §§ 1600 et seq., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.

4. An actual, justiciable controversy exists between Plaintiffs and the Forest Service. The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705, 706. Plaintiffs have exhausted all administrative remedies and provided the requisite notice under the ESA.

5. The decision giving rise to this complaint was made in Missoula, Montana by the Forest Service's regional office. Venue is properly vested in this Court by 28 U.S.C. § 1391(e).

PARTIES

6. Plaintiff ALLIANCE FOR THE WILD ROCKIES (AWR) is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its

native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Helena, Montana. AWR has more than 2,000 individual members, many of whom reside in Montana, and more than 600 member businesses and organizations, many of which are located in Montana. Members of AWR work as fishing guides, outfitters, and researchers who observe, enjoy, and appreciate Montana's native wildlife and the water quality of aquatic ecosystems in Montana's lakes and streams, as well as the habitat quality of terrestrial ecosystems upon which they depend, and expect to continue to do so in the future, including in the project area. Members professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems.

7. Plaintiff NATIVE ECOSYSTEMS COUNCIL (NEC) is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Beaverhead-Deerlodge National Forest for work and outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Beaverhead-Deerlodge National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

8. Defendant JANE L. COTTRELL is acting Regional Forester of Region 1 of the United States Forest Service, which includes the Beaverhead-Deerlodge National Forest. She replaces Tom Tidwell, Regional Forester of Region 1, who

signed the Record of Decision for the revised Beaverhead-Deerlodge Land and Resource Management Plan before being appointed Chief of the United States Forest Service on June 17, 2009.  She is sued in her official capacity.

9. Defendant UNITED STATES FOREST SERVICE is responsible for the lawful management of the national forests, including the Beaverhead-Deerlodge National Forest.  Region 1 of the Forest Service, the Northern Region, is headquartered in Missoula, Montana.  The Northern Regional Office signed the Record of Decision for the revised Beaverhead-Deerlodge LRMP, which is challenged in this action.

## BACKGROUND

<u>Revision of the Beaverhead-Deerlodge National Forest Land and Resource Management Plan (revised Forest Plan).</u>

10. In 2002, the Beaverhead-Deerlodge National Forest (BDNF) began the process of revising its Forest Plan.

11. In February, 2008, the BDNF released the final environmental impact statement (FEIS) and Record of Decision (ROD) for the revised Forest Plan.

12. With the release of the FEIS and ROD, the Forest Service initiated an administrative appeals period for the revised Forest Plan pursuant to 36 C.F.R. § Part 217.

13. Plaintiffs timely filed administrative appeals of the revised Forest Plan, which were still pending as of the date of the filing of the original complaint in this matter (this amended complaint relates back and incorporates all portions of the original complaint).

<u>The Rat Creek timber sale</u>.

14. In August and September of 2007, the Rat Creek fire burned approximately 26,600 acres of the BDNF, Bitterroot National Forest, and private land along the Continental Divide northeast of Chief Joseph Pass and west of

Wisdom, Montana.

15. The fire burned part of the Beaver Lake Inventoried Roadless Area.

16. The fire burned at varying intensities, completely consuming some areas of forest entirely, while leaving other stands, patches, and individual trees alive.

17. The fire caused soil heating and soil erosion in some areas, which have impacted water quality.

18. On April 10, 2008, the Forest Service announced plans to harvest approximately 1,652 acres of trees (dead, dying, and live, green trees) within the perimeter of the area that was burned by the Rat Creek fire.

19. The proposed "Rat Creek salvage" project ("Rat Creek project" or "project") includes thirty five (35) harvest units ranging in size from 3 to 320 acres.

20. The project will utilize a "regeneration harvest" (clearcut) and entails the construction of approximately 7 miles of new roads and the reopening of approximately 3 miles of existing roads.

21. The proposed clearcuts will result in eleven forest openings exceeding 40 acres in size.

22. On July 22, 2009, the Forest Service issued a final environmental assessment (EA) and decision notice and finding of no significant impact (DN/FONSI) for the Rat Creek project.

23. Accompanying the DN/FONSI, the Forest Service wrote in a cover letter that on July 1, 2009, Chief of the Forest Service Abigail R. Kimbell made the determination that an emergency situation existed consistent with 36 C.F.R. § 215.10 (b), and that the Rat Creek project was not subject to a stay of implementation pending administrative appeal of the project. No other documentation accompanied the emergency situation determination.

24. On June 17, 2009, Department of Agriculture Secretary Tom Vilsack

appointed Tom Tidwell as the new Chief for the U.S. Forest Service. Ms. Kimbell has not been Chief of the Forest Service since that time.

25. The Rat Creek project is tiered to the revised Forest Plan.

## COUNT I

### (NEPA Violation)

(failure to take hard look at impacts to lynx)

26. Plaintiffs incorporate by reference all preceding paragraphs.

27. Pursuant to NEPA, the Forest Service must take a hard look at how the Rat Creek project and revised Forest Plan for the BDNF may impact (directly, indirectly, and cumulatively) native wildlife, including Canada lynx ("lynx").

28. Direct effects are caused by the action(s) and occur at the same time and place. Indirect effects are caused by the action(s) but occur later in time or are farther removed in distance but are still reasonably foreseeable. Cumulative effects are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

29. In adopting the revised Forest Plan and approving the Rat Creek project, the Forest Service determined there would be "no effect" on lynx because the area is "unoccupied" by the species.

30. The best available science on lynx, including data from Montana Fish, Wildlife & Parks, U.S. Fish & Wildlife Service (FWS), the Federal Lynx Biology team, and independent wildlife surveys indicate that Southwest Montana, including the BDNF and Rat Creek project area, includes suitable lynx habitat and is occupied by lynx.

31. On May 11, 2006, the Forest Service adopted a new definition of

"occupied" lynx habitat and determined, via an internal amendment to a conservation agreement with FWS (no public review or comment), that the BDNF was no longer occupied by lynx. The Forest Service based this determination solely on the National Lynx Survey.

32. On March 23, 2007, the Forest Service signed a final Record of Decision (ROD) approving the "Northern Rockies Lynx Management Direction" (NRLMD), which includes new forest plan standards to conserve lynx in Montana. In the ROD, the Forest Service determined that the BDNF was "unoccupied" by lynx.

33. In adopting the revised Forest Plan for the BDNF and approving the Rat Creek project, the Forest Service determined there would be no impacts to lynx, in part, because the area is "unoccupied."

34. The Forest Service's determination that the BDNF and the Rat Creek project area are "unoccupied" by lynx, and thus that no impacts would occur to lynx from the revised Forest Plan and Rat Creek project, is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706 (2)(A).

## COUNT II
### (NEPA Violation)
(failure to disclose and analyze opposing scientific opinion on snag retention)

35. Plaintiffs incorporate by reference all preceding paragraphs.

36. Pursuant to NEPA, the Forest Service must disclose and analyze in an environmental assessment (EA) and environmental impact statement (EIS) the scientific information counseling against the activities proposed by the agency or calling into question the expected environmental effects of a proposed action. 40 C.F.R. §§ 1502.9(b), 1502.24, 1508.27(b)(4).

37. The revised Forest Plan requires the Forest Service to retain 6.4 snags

6

greater than 15 inches in diameter at breast height ("dbh") in pinus contorta woodland harvest areas. This per-acre standard, however, can be waived where snag retention goals will be met "for the project area as a whole."

38. By quantifying snag retention across "the project area as a whole," the revised Forest Plan standard effectively nullifies the per-acre snag retention requirement, allowing no snags to be left in any given harvest unit.

39. Also, the lack of any snag direction for mid-sized snags in the revised Forest Plan means that in any given harvest unit, and across the project area as a whole, few to no snags may be left standing.

40. The best available science reveals that minimum per-acre snag requirements must established and met in order to maintain viable wildlife populations in post-burn areas. The scientific literature recommends that snags be retained in clumps across harvested areas.

41. In the EA for the Rat Creek project, the Forest Service indicates that a snag retention standard of 6.4 snags greater than 15" dbh will be maintained consistent with the revised Forest Plan standard. The EA states that snag retention standards will be applied "across the sum total acreage of all harvest units, or the sum total acreage of the burn perimeter" with the result that no snags may be retained in any given harvest unit.

42. In approving the Rat Creek project and revised Forest Plan for the BDNF, the Forest Service failed to disclose and discuss outside scientific literature recommending minimum per acre snag requirements that differ from its own internally generated documentation.

43. The Forest Service's failure to disclose and analyze scientific information counseling against the Agency's snag standard or that call into

question the expected environmental effects of the standard in the EIS for the revised Forest Plan and EA for the Rat Creek project is arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706 (2)(A).

## COUNT III
### (NEPA Violation)
### (EIS required)

44. Plaintiffs incorporate by reference all preceding paragraphs.

45. NEPA requires the Forest Service to prepare an EIS when a federal action may significantly affect the quality of the environment.

46. In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27.

47. In evaluating intensity, the Forest Service must consider numerous "significance" factors including whether there will be: (1) impacts to an ecologically critical area, impacts to threatened and endangered species, and cumulative impacts; (2) whether impacts are likely to be highly controversial and uncertain; and (3) and whether the project was approved in violation of law or establishes precedent for future actions. 40 C.F.R. §1508.27(b).

48. The Rat Creek project may "significantly" impact the environment requiring preparation on of an EIS.

49. The Forest Service's decision not to prepare an EIS for the Rat Creek project is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

COUNT IV

(Appeals Reform Act Violation)

(failure to demonstrate need for emergency situation)

50. Plaintiffs incorporate by reference all preceding paragraphs.

51. Pursuant to the Appeals Reform Act (ARA), unless the Chief of the Forest Service "determines that an emergency situation exists with respect to a decision of the Forest Service, implementation of the decision shall be stayed . . ." 16 U.S.C. § 1612 (note), § 322 (e).

52. The regulations implementing the ARA provide for an emergency situation determination (ESD) when "immediate implementation of all or part of a decision is necessary for relief from hazards threatening human health and safety or natural resources on those NFS or adjacent lands; or that would result in substantial loss of economic value to the Federal Government if implementation of the decision were delayed." 36 C.F.R. § 215.10 (2003).

53. The Forest Service has failed to demonstrate the need for an ESD when approving the Rat Creek project.

54. The Forest Service has failed to show that immediate implementation of all or part of the Rat Creek project is necessary for relief from hazards threatening human health and safety or natural resources on those NFS or adjacent lands; or that the Rat Creek project would result in substantial loss of economic value to the Federal Government if implementation of the decision were delayed.

55. The Forest Service's failure to demonstrate a need for its ESD when approving the Rat Creek project is arbitrary, capricious, and not in accordance with the ARA. 5 U.S.C. § 706(2)(A).

COUNT V

(Appeals Reform Act Violation)

(ESD based on economic loss to the United States is inconsistent with Congressional intent)

56. Plaintiffs incorporate by reference all preceding paragraphs.

57. The National Forest Management Act (NFMA) provides not only for planning on national forests, but also for public participation in the planning process.  16 U.S.C. §§ 1600, 1612.

58. In 1989, the Forest Service revised its regulations pertaining to public participation in the decision-making process.  Among other provisions, those regulations provided the public with the opportunity to comment on and administratively appeal decisions implementing Forest Plans.

59. In 1992, Congress passed the ARA, which amended the NFMA and clarified the public participation process required by NFMA.  16 U.S.C. § 1612 (note).

60. Pursuant to the ARA, the Forest Service must provide notice, opportunity to comment, and the right to administratively appeal proposed actions of the Forest Service concerning projects and activities implementing Forest Plans.

61. Pursuant to the ARA, unless the Chief of the Forest Service "determines that an emergency situation exists with respect to a decision of the Forest Service, implementation of the decision shall be stayed . . ." 16 U.S.C. § 1612 (note), § 322 (e).

62. In 2003, the Forest Service revised the regulations pertaining to public participation in decisions implementing Forest Plans.  Among other things, the 2003 regulations permit the Forest Service to make an "emergency situation determination" for projects "for which immediate implementation of all or part of a decision is necessary for relief from hazards threatening human health and safety or natural resources on those NFS or adjacent lands; or that would result in

substantial loss of economic value to the Federal Government if implementation of the decision were delayed." 36 C.F.R. § 215.2 (2003).

63. Neither the ARA nor NFMA mention "substantial loss of economic value to the Federal Government" as a valid reason for issuing an emergency situation determination (ESD).

64. Congress never intended to include "substantial loss of economic value to the Federal Government" as a valid reason for issuing a ESD in the ARA or NFMA.

65. The Forest Service's regulation defining an ESD to include the "substantial loss of economic value to the Federal Government" (36 C.F.R. § 215.2), as applied to the Rat Creek project, is inconsistent with Congressional intent in the ARA and NFMA and arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

## COUNT VI
## (Endangered Species Act violation)
### (failure to initiate and complete consultation on revised Forest Plan)

66. Plaintiffs incorporate by reference all preceding paragraphs.

67. Pursuant to section 7 of the Endangered Species Act (ESA), the Forest Service must, in consultation with the U.S. Fish & Wildlife Service, ensure that any action authorized, funded, or carried out by the agency is not "likely to jeopardize" the continued existence of any listed species. 16 U.S.C. § 1536 (a)(2); 50 C.F.R. § 402.14. In fulfilling the requirements of section 7 of the ESA "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536 (a)(2).

68. The phrase "jeopardize the continued existence of" means to "engage in action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in

the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.2

69. The Forest Service's revised Forest Plan is an agency action that may affect lynx (a threatened species) and lynx habitat in the BDNF.

70. The best scientific and commercial data available demonstrates that the BDNF includes suitable lynx habitat (denning, foraging, and linkage), is occupied by lynx, and that Forest Plans that do not include conservation measures for lynx are a significant threat to the survival and recovery of lynx in Montana.

71. In preparing and adopting a revised Forest Plan for the BDNF the Forest Service failed and/or refused to initiate and complete formal section 7 consultation on lynx.

72. In preparing and adopting a revised Forest Plan for the BDNF, the Forest Service also failed, and continues to fail, to use the best scientific and commercial data available on lynx to ensure that the revised Forest Plan is not likely to jeopardize the continued existence of lynx in the BDNF.

73. The Forest Service's failure to initiate and complete formal consultation, and use the best scientific and commercial data available, on how its revised Forest Plan may affect lynx violates section 7 of the ESA and constitutes "agency action unlawfully withheld or unreasonably delayed" and is "arbitrary and capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. §§ 706 (1), 706 (2)(A).

## RELIEF REQUESTED

74. Plaintiffs incorporate by reference all preceding paragraphs

75. WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

   A.   Declare that the Forest Service's revised Forest Plan and approval of the Rat Creek Project violated the NEPA, the ARA, and the ESA as alleged above;

   B.   Declare that the Forest Service's violation of NEPA, the ARA, and the

ESA as alleged above is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes agency action unlawfully withheld or unreasonably delayed under the APA;

 C. Set aside and/or vacate all or a portion of the Forest Service's revised Forest Plan, the Forest Service's emergency situation determination, and the Forest Service's approval of the Rat Creek project;

 D. Order the Forest Service to prepare an EIS and provide for a valid administrative appeals process before approving the Rat Creek project or any on-the-ground work associated with the Rat Creek project.

 E. Order the Forest Service to initiate and complete formal consultation on how the revised Forest Plan may affect lynx pursuant to section 7 of the ESA;

 F. Order the Forest Service to re-evaluate and re-assess its determination that the BDNF is "unoccupied" by lynx.

 G. Enjoin the Forest Service from conducting and/or authorizing any and all work and/or ground disturbing activity relating to the Rat Creek project until the Agency fully remedies the violations of NEPA, the ARA, and the ESA alleged herein;

 H. Order the Forest Service to take affirmative steps to mitigate and/or remedy any environmental harm caused by implementation of the Rat Creek project before the preliminary injunction issued in this matter and while this civil action was pending;

 I. Declare that the "emergency situation" definition of 36 C.F.R. § 215.2 (2003) violates the ARA;

 J. Set aside and/or vacate the "emergency situation" definition found at 36 C.F.R. § 215.2 (2003);

 K. Order the Forest Service to initiate and complete rulemaking to adopt a new regulatory definition of "emergency situation" consistent with Congressional intent within a reasonable amount of time;

L. Issue such injunctive relief as Plaintiffs may subsequently request;

M. Retain continuing jurisdiction of this matter until the Forest Service fully remedies the violations of law complained of herein;

N. Grant Plaintiffs their costs and expenses of litigation, including reasonable attorneys' fees for claims brought under the ESA pursuant to 16 U.S.C. § 1540 (g);

O. Grant Plaintiffs their costs and expenses of litigation, including reasonable attorneys' fees for claims brought under NEPA and the ARA pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C § 2412;

P. Grant such other relief that this Court deems necessary, just, and proper.

Respectfully submitted this 27th day of June, 2011.

/s/ Matthew Bishop
Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 324-8011 (tel.)
bishop@westernlaw.org

/s/ Susan Jane Brown
Susan Jane M. Brown
Western Environmental Law Center
4107 N.E. Couch St.
Portland, OR 97232
(503) 914-1323 (tel.)

Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2011, I filed a copy of this document electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

/s/ Matthew Bishop
Matthew Bishop